J-S15017-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: Z.R.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.H.-B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 111 WDA 2021 |

Appeal from the Order Entered December 22, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court
at No(s): CP-02-AP-0000145-2019

| | | |
|---|---|---|
| IN RE: M.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.H.-B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 112 WDA 2021 |

Appeal from the Order Dated December 22, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court
at No(s): CP-02-AP-146-2019

| | | |
|---|---|---|
| IN RE: D.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF M.H.-B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 113 WDA 2021 |

Appeal from the Order Entered December 22, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court
at No(s): CP-02-AP-147-2019

IN RE: J.B., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF M.H.-B., MOTHER : 
:
:
:
:
:
: No. 114 WDA 2021

Appeal from the Order Entered December 22, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court
at No(s): CP-02-AP-000148-2019

BEFORE: LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J: **FILED: JUNE 24, 2021**

M.H.-B. (Mother) appeals from the orders involuntarily terminating her parental rights to her daughters, Z.R.B., born January 2013, and M.B., born July 2015; and sons, D.B., born September 2016, and J.B., born December 2017 (collectively, the Children).[1] After careful review, we affirm.

In its memorandum accompanying the orders, the orphans' court set forth findings of fact, which the record supports, and which we adopt in this decision. Orphans' Court Opinion, 12/22/20, at ¶¶ 1–57.

By way of background, Allegheny County Office of Children, Youth, and Families (CYF) first became involved with this family in 2014, due to two-year-

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] In the same orders, the orphans' court involuntary terminated the parental rights of the Children's father, B.B. (Father), who has not appealed.

- 2 -

old Z.R.B. failing to thrive, and her parents failing to take her to medical appointments. Orphans' Court Finding of Fact, 12/22/20, at ¶ 4. Mother and Father also had unstable housing. *Id.* at ¶¶ 5-6. CYF provided services to the family to address these problems. *Id.* at ¶ 6. Nevertheless, between April of 2015 and October of 2017, CYF received multiple referrals alleging Mother and Father had inappropriate housing. *Id.* at ¶ 10.

In October of 2017, CYF received a referral that two-year-old M.B. and thirteen-month-old D.B. were failing to thrive and had "significantly low body weight." *Id.* at ¶ 11. In addition, their parents failed to take them to their medical appointments. *Id.*

Thereafter, CYF received a report that on December 23, 2017, Mother took then fifteen-month-old D.B. to the emergency room at Children's Hospital of Pittsburgh, where he was diagnosed with a displaced fracture of his right femur. D.B. underwent surgery to repair his femur on December 24, 2017. *Id.* at ¶¶ 12-13; N.T., 2/7/20, at 53. The orphans' court found as follows regarding D.B.'s injury:

> 15. Due to the serious nature of the injury, an expert in child abuse, Dr. Jennifer Wolford, was contacted by the hospital for consultation.
>
> 16. Dr. Wolford not only reviewed the medical records as to D.B., but [she] also reviewed the history that was provided to various medical personnel by [M]other.
>
> 17. [M]other provided multiple explanations as to the nature of the injury. To some medical personnel, [M]other stated that D.B. fell down steps; thereafter, [D.B.] was able to walk, but upon

waking the next morning, he was lying in his crib, fussy, and unable to move his leg.

18. Mother also reported to medical personnel that at the time of the injury, D.B was being watched by [F]ather, and it was a sibling [who] reported that D.B. fell down steps, and thereafter was unable to walk.

19. Dr. Wolford, in her expert medical opinion, opined that D.B. could not have sustained a broken femur from falling down steps, especially since he presented no other injuries that would be expected, such as scrapes or bruises. . . .

20. She further opined, in her expert opinion, that such an injury was not possible[, and] that in her 10 years of practice, she had never seen such trauma caused by a fall down steps.[2]

21. Further, she stated that [after sustaining such an injury], [D.B.] would not be able to walk, and would have been in excruciating pain, such that he would have been laying on the floor crying uncontrollably.

22. Dr. Wolford stated in her opinion that the injuries suffered by D.B. could only be caused by serious trauma such as would be seen in a high-speed automobile accident.[3]

23. Given the multiple explanations provided by Mother, none of which are deemed to be adequate. . . ., Dr. Wolford believed that there were serious concerns [regarding child abuse]. . . .

_____

[2] Dr. Wolford stated, "In my ten years as a pediatrician, I have not evaluated a complete displaced transverse fracture as a result of a household stair fall. It is far more likely that another event caused this fracture. Again, this raises grave concerns for physical child abuse." N.T., 2/7/20, at 46.

[3] Dr. Wolford described D.B.'s injury as "a very high impact fracture. It is a complete fracture. It's a complete break. It's in the middle of the leg. This is a high force injury." N.T., 2/7/20, at 42. She explained, "The femur is one of the strongest bones in the body." *Id.* at 49. Dr. Wolford offered an example of the force necessary to break the femur. She testified, "this is the type of injury we would see in a high[-]speed car accident where someone straightens the leg in order to slam a brake." *Id.* at 47.

. . .

25. This [c]ourt accepts as credible the opinions of Dr. Wolford. Further, this [c]ourt agrees that if the injuries sustained by D.B. occurred on December 23, 2017, th[en] medical treatment should have been sought immediately.[4] As such, if [true,] as related by [M]other, that the injuries occurred [a] day[] earlier, it would show extreme medical neglect as to the injuries sustained by D.B.[5]

26. This [c]ourt finds . . . [M]other and [F]ather have failed to provide any plausible explanation as to the injuries sustained by D.B.

27. This [c]ourt finds **not only** that the injuries sustained by D.B., if left unaddressed as [M]other stated in one of her stories, showed extreme neglect, but, based on the multiple explanations provided [by Mother,] shows to this [c]ourt **that the injury occurred to D.B. through some other severe trauma that has yet to be fully disclosed.**

Orphans' Court Opinion, 12/22/20, at ¶¶ 15-27 (emphasis added).

_____

[4] Dr. Wolford testified that Mother reported, "At 5 a.m. on December 23 [M]other found the child in bed crying and he would not move his right leg. . . . At 7 p.m., 13 hours later, she had arrived home and [D.B.] was still fussy. So she brought him into the emergency room. . . . [T]here is a concern for the delay of seeking care for this child who la[y] in pain for the better part of a full day before getting [medical] care." N.T., 2/7/20, at 43-44.

[5] Dr. Wolford testified that Mother reported "on December 22, this 15-month[-]old tried to follow his four-year-old sister up the stairs. And then he fell down a few of the stairs. [M]other was in the other room and did not see the event. The child cried and then was able to walk after. And he continued to play. So she did not seek medical care." N.T., 2/7/20, at 42-43. Dr. Wolford further testified, "After this injury occurred, this child did not walk. His leg is broken in half. And the lack of any history by any reasonable adult that there was an injury and then he cried and didn't walk, the absence of that is a large part of my assessment that this is gravely concerning for physical abuse." **Id.** at 50.

On December 24, 2017, the juvenile court placed Z.R.B., M.B., and D.B. in the emergency custody of CYF. *Id.* at ¶ 28. J.B. was born shortly thereafter, and the court immediately placed him in the emergency custody of CYF. *Id.* at ¶ 29. On January 3, 2018, the court placed the Children in shelter care. On February 21, 2018, the court adjudicated the Children dependent. *Id.* at ¶ 30.

In furtherance of the Children's permanency goal of reunification, Mother was required to participate in psychosocial assessments, parenting classes, coached visitation, therapeutic visitation, and the Children's medical appointments. *Id.* at ¶ 31. Mother was further required to obtain and maintain stable housing; obtain a mental health assessment; maintain communication and cooperation with CYF; and provide an adequate explanation as to how D.B. sustained the displaced fracture to his right femur. *Id.*

On August 2, 2019, CYF filed petitions for the involuntary termination of Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). A hearing occurred on February 7, 2020 and June 12, 2020,[6] when the Children had been in placement for 30 months.[7] Z.R.B., M.B., and

---

[6] The court conducted the June 12, 2020 hearing remotely per Covid-19 protocol.

[7] Cynthia Moore, Esquire, represented Children's legal interests. At the conclusion of presentation of the parties' evidence, Attorney Moore stated on

D.B. resided together in a pre-adoptive foster home. N.T., 2/7/20, at 166, 170. J.B. also resided in a pre-adoptive foster home. *Id.* at 172.

CYF presented the testimony of Jennifer Wolford, M.D., by telephone from Children's Hospital of Pittsburgh, Child Advocate Center; Erin Carlson, caseworker at Pressley Ridge; Erika Allegrucci, TRAC[8] Services for Families (TRAC) caseworker; Erin Snyder, CYF caseworker supervisor; and Patricia Pepe, Ph.D., an expert in forensic and child psychology. Attorney Moore presented the testimony of Jami Lyn Duane-Brady and Kelly Ryan-Schmidt, TRAC therapists who provided trauma therapy for Z.R.B. and M.B. Mother presented the testimony of Erin Snyder, the CYF supervisor.

By orders dated December 22, 2020, and entered December 23, 2020, the orphans' court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). Mother timely filed notices of appeal and concise statements of errors complained of on

_____

the record that two-year-old J.B., and three-year-old D.B., due to their ages and level of development, were "unable to formulate a subjective articulable preference" with respect to the termination proceedings. N.T., 6/12/20, at 188. Attorney Moore stated that four-year-old M.B., while "also too young to formulate a subjective articulable preference, . . . did voice to me that she wished to be adopted by her foster parents." *Id.* at 188-189. Attorney Moore stated that seven-year-old Z.R.B. "did not understand the termination litigation. But she did advise me that she wanted to be adopted by her foster parents." *Id.* at 189.

[8] "TRAC" is the acronym for "Three Rivers Adoption Council." N.T., 2/7/20, at 99.

appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.

On appeal, Mother presents a single question:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that termination of Mother's parental rights would serve the needs and welfare of the Children pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 12.

Preliminarily, we recognize:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests

of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the orphans' court involuntarily terminated Mother's parental rights pursuant to the following provisions of the Adoption Act:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the

removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (5), (8), (b).

Mother acknowledges CYF proved by clear and convincing evidence that her conduct warranted termination under Section 2511(a)(2). Mother's Brief at 18-19. Thus, we review the orders pursuant to Section 2511(b) only. ***See Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (any issue not set forth or suggested in an appellate brief's statement of questions involved or raised in a statement of matters complained of on appeal is deemed waived).

In reviewing the orders pursuant to Section 2511(b), we are mindful of the following:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. ***In re K.K.R.S.***, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the

- 10 -

termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Further, our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that children "are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Mother recognizes that under Section 2511(b), "consideration of the needs and welfare of the children pursuant to subsection (b) focuses primarily on the welfare of the child and not the fault of the parent." Mother's Brief at

22 (citation omitted). Mother insists that, in terminating her parental rights pursuant to Section 2511(b), the court "abused its discretion and erroneously applied a fault-based analysis in concluding that termination would serve the needs and welfare of the Children pursuant to 23 Pa.C.S. §2511(b)." *Id.* at 23. We disagree.

Contrary to Mother's assertion, the orphans' court considered the relevant factors in terminating Mother's parental rights pursuant to Section 2511(b). The court found CYF's witnesses to be credible in concluding that no bond exists between Mother and Children. Orphans' Court Memorandum, 12/22/20, at 16. The court reasoned:

> Most persuasive and convincing is the testimony of Dr. Patricia Pepe, the [c]ourt[-appointed] [e]xpert, whose findings and opinions were scientific, methodical, substantiated, predicated, sensible, and evidence-based. Based on her assessments and findings, Dr. Pepe opined on a number of significant issues. Dr. Pepe found that [the C]hildren have exhibited a great deal of progress, positive and primary attachment to the primary caregivers, and the [C]hildren indicated to Dr. Pepe that they wish to remain in their current placement. ([N.T., 6/12/20, at 30-31]). In the course of Dr. Pepe's evaluations, she shared in her testimony that her observations [regarding] the foster parents [with] the [C]hildren included consistent, pervasive, happy feelings and interaction. ([N.T., 6/12/20, at 36-37]). Dr. Pepe indicated in CYF Exhibit #7, which is a report of her evaluations dated July and August 2019, page 41, that [the C]hildren would be at high risk if removed from their current caregivers because [the C]hildren have developed primary bonds with their respective caregivers.

Orphans' Court Memorandum, 12/22/20, at 16-17. As such, the court concluded it would not be detrimental to the Children to terminate Mother's

- 12 -

parental rights. *Id.* at 16. Our review of Dr. Pepe's testimony comports with the court's findings, and we discern no abuse of discretion.

Dr. Pepe observed the Children separately with Mother and Father. When Father left the room, and Mother entered, Dr. Pepe observed:

> [Z.R.B.] was very disappointed, not wanting [F]ather to leave. But was reassured that he would come back. [D.B.] became much more detached. He was just standing kind of bewildered. Sucking his thumb. And [M.B.] was just angry. She said she didn't want to play with [M]other. She didn't want to talk to [M]other. And when [Mother] asked [D.B.] for a hug, he actually said no. But eventually he and [M.B.] approached [M]other.
>
> [Z.R.B.] didn't want to be alone with [M]other. And [J.B.] was relatively detached. It wasn't reflective of positive bonding or positive attachment between the [C]hildren and [M]other. . . .

N.T., 6/12/20, at 35-36.

Dr. Pepe also observed the older three children, Z.R.B., M.B., and D.B., who reside in the same foster home, interact with their foster parents. She testified:

> They constantly interacted with their foster parents. They went to them for help. It was just a consistent, pervasive, happy feeling and interaction. The family functioned in a very positive and cohesive manner. There were often, very often, spontaneous exchanges of physical affection.
>
> [M.B.] and [Z.R.B.] were consistently relaxed. [They] exhibited multiple bonds and behaviors suggestive of a positive primary attachment.

*Id.* at 36-37.[9]

Dr. Pepe testified regarding her observation of the youngest child, J.B., with his foster parents, as follows:

> He has been in foster care since he was two days old.  He was active.  Expressive.  Happy.  Always smiling.  Often exhibiting spontaneous physical affection.  Foster parents were very responsive to him.  I mean, he definitely exhibited multiple bonding behaviors suggestive of a primary attachment.  . . .

*Id.* at 37.

Dr. Pepe opined, "I do believe that it is in [the Children's] best psychological interest to remain in their current homes permanently through adoption." *Id.* at 38.  She explained:

> First of all, we've addressed a lot of issues regarding parents . . . not having insight into the [C]hildren's functioning and not meeting their initial needs.  And when a primary bond is broken with children, especially in early childhood, there are indications that there are both neurological and psychological impacts that occur presently.  And also can result [in] long-term damage.
>
> There are studies now that show that there is impact on the functioning of the brain.  . . .  High likelihood of negatively impacting future development.  A positive healthy attachment provides the framework for all future attachments.  And a poor attachment o[r] breaking an attachment is associated with many emotional or behavioral problems later in life.
>
> **So I believe . . . the [C]hildren would be at a very high risk if they were removed from their current homes**.

---

[9] With respect to physical needs and welfare, Dr. Pepe testified, "[A]s soon as [Z.R.B., M.B., and D.B.] were brought into foster care, [they] gained significant weight.  They have been healthy.  And, yes, none of the [C]hildren have had serious injuries.  They have been safe and well cared for.  And they have been fed.  And this is very important for the foundation of their entire lives." *Id.* at 41.

*Id.* at 38-39 (emphasis added).

Dr. Pepe testified on direct examination:

Q. [W]ill [the C]hildren be psychologically harmed if the [c]ourt does grant CYF's petition and terminate[s] parental rights?

A. I do not see that they would be psychologically harmed . . . . [J.B.] was just detached. He doesn't know. He's never lived [with his parents]. [M.B.] is angry**. Both [M.B.] and [Z.B.] have clearly expressed their desire to be adopted. They have expressed it over and over to me**. And [D.B.] definitely exhibited primary attachment to his foster parents. And while to some degree he could be engaging with his parents, he didn't exhibit a primary bond with them.

*Id.* at 39 (emphasis added).

Finally, Dr. Pepe testified regarding her individual evaluations of the two oldest children. With respect to Z.R.B., she stated:

[Z.R.B.] was six[-]and-a-half[-]years[-]old during the initial evaluation. And when asked if there were any differences between her current home or her previous home, she began to hit herself. Which is very unusual behavior. So I stopped questioning at that point because I didn't want her to harm herself.

It was interesting because she previously said in her testing that she wanted her father to stop hitting her. Her greatest fear was being hit. She felt sad. Wishes she was happy. She made multiple allegations. She was also [diagnosed while in her parents' custody with] failure to thrive. She was having nightmares about things in her words that happened to her. So her response of hitting herself I thought was very significant.

*Id.* at 46-47.

With respect to M.B., Dr. Pepe testified that M.B. was three years and eleven months old at the time of the evaluation, and Dr. Pepe's testing of M.B. revealed "either neurological damage or severe neglect. And I believe that

this reflection is likely a result of her early diagnosis of failure to thrive[, w]hich, as I said, appears to have long-term, if not permanent, negative impact on . . . general functioning." *Id.* at 45. Dr. Pepe testified M.B. "exhibited most difficulty with" gross and fine motor skills. *Id.* She stated, "for motor skills, [M.B.] had a range equivalent score of two years. Two years and zero months. So that's indicative of [M.B.] having significant problems." *Id.* Dr. Pepe diagnosed M.B. with post-traumatic stress disorder (PTSD), and recommended trauma-based psychotherapy. *Id.*

Kelly Ryan-Schmidt, the director of therapeutic services at TRAC, testified that she was M.B.'s therapist from the summer of 2019, until the Covid-19 pandemic quarantine, when Jami Lyn Duane-Brady, the senior outpatient therapist at TRAC, began to treat M.B. N.T., 6/12/20, at 148. Ms. Ryan-Schmidt testified that M.B. is diagnosed with PTSD, disinhibited social engagement disorder, and disruptive mood dysregulation disorder. *Id.* at 149-150. Regarding M.B.'s prognosis, she stated she was "very concerned for [M.B.] and [the] life-long struggle that she will have related to her trauma and how that trauma will impact relationships throughout her childhood and adulthood." *Id.* at 153.

With respect to Z.R.B., Ms. Duane-Brady began treating her for PTSD at the beginning of the Covid-19 pandemic. She testified:

> [Z.R.B. has] made a significant amount of progress, but we still have some very specific concerns about her mental health. Again, we are continuing to work on her ability to express her own thoughts and feelings. . . . She still struggles with determining

which people are safe and which people are not safe and what safe behavior with adults looks like.

She is struggling with coping skills. She can use them when prompted, but doesn't use them independently to help her manage her emotions. . . .

N.T., 6/12/20, at 100-101.

The testimony of Dr. Pepe, and the TRAC therapists, Ms. Ryan-Schmidt and Ms. Duane-Brady, supports the court's conclusion that termination of Mother's parental rights serves the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). Dr. Pepe testified that "out of necessity, children need to feel safe and secure. And they adapt to their environment. I believe that the [C]hildren would . . . experience a great deal of harm if they were separated from their current caregivers." N.T., 6/12/20, at 40-41. Accordingly, we discern no error and affirm the orders involuntarily terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/24/2021